663 P.2d 570

**In the Matter of Petition for Court-Ordered Treatment of Matthew ANDERSON, Plaintiff-Appellant,**

v.

**STATE of Arizona, Defendant-Appellee.**

**No. 1 CA–CIV 5946.**

Court of Appeals of Arizona,
Division 1, Department A.

Aug. 24, 1982.
Rehearing Denied March 2, 1983.
Review Denied April 19, 1983.

Ross P. Lee, Maricopa County Public Defender by Edward C. Voss, Deputy Public Defender, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by H. Charles Pyeatte, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

CONTRERAS, Judge.

At issue is the right of an adult who has not been adjudged incompetent but who is involuntarily committed to the Arizona State Hospital (ASH) to refuse, in non-emergency situations, to take psychotropic (anti-psychotic) drugs prescribed for his treatment. We conclude that such drugs can only be administered in strict accordance with the Arizona Mental Health Services Act (MHSA), and that, absent the statutory preconditions, the trial court erred in ordering administration of such drugs to appellant. We therefore reverse and remand.

## FACTUAL BACKGROUND

Appellant is a 31-year-old man who has spent most of the last decade in various penal and psychiatric institutions. The period of confinement which gave rise to this legal action began in October 1977 when appellant was committed to ASH under the provisions of Rule 11, Arizona Rules of Criminal Procedure. In November 1977, his commitment was changed to civil commitment. On June 2, 1978, R. Robertson Kenner, M.D., Superintendent of ASH, filed a petition for court-ordered treatment, pursuant to A.R.S. § 36-533, alleging that appellant was a danger to both himself and others, and in need of treatment. The affidavit of John W. Marchildon, M.D., stated that appellant

> has a long history of antisocial behavior which is inadequately handled because of his frequent involvement in the behavioral health system as he is subject to psychotic episodes which may be either endogenous or drug induced. He currently presents a management problem, even on the Maximum Security ward. He resists therapeutic efforts, including medication, and is without insight into the dangerousness, inappropriateness, and illegality of his acts.

The affidavit of Harrison M. Baker, M.D., stated that appellant

> represents an admixture of schizophrenia and antisocial personality.

On June 8, 1978, the trial court, after an appearance by appellant, ordered him to be hospitalized at ASH for a period not to exceed 180 days. Similar petitions were filed approximately every six months thereafter, and each time hospitalization was ordered for an additional period not to exceed 180 days. Appellant was released from treatment on July 1, 1980, but a new petition was filed, and treatment ordered, later in the same month.

Appellant has steadfastly maintained his unwillingness to accept psychotropic medication, and has repeatedly complained of side effects. On several occasions, he has

sought relief in the courts. Appellant filed a request for judicial review in February 1979; it was denied in March 1979. At a hearing on December 3, 1979, appellant, through appointed counsel, made an oral motion for an order allowing him to refuse treatment. Each party submitted a memorandum of points and authorities, and the motion was denied by a minute entry dated January 11, 1980, which was reduced to a signed order dated March 20, 1981. The order provides, in pertinent part:

> Now therefore, the court finds that for the patient Mathew Anderson to receive proper hospital treatment it is necessary that conventional psychotropic medications for treatment be administered against the will and wishes of the patient.

> It is therefore ordered denying patient's motion and it is further ordered that the Arizona State Hospital shall administer any conventional psychotropic medication to the patient with or without patient's consent that the medical director of said hospital deems appropriate in the treatment of this patient.

This appeal follows.

## MEDICAL BACKGROUND

During his hospitalization, appellant has received several different psychotropic (anti-psychotic) drugs, including:

| | |
|---|---|
| Prolixin-D | (fluphenazine hydrochloride) |
| Permitil | (fluphenazine hydrochloride) |
| Trilaphon | (perphenazine) |
| Stelazine | (trifluoperazine hydrochloride) |
| Vistaril | (hydroxyzine hydrochloride) |
| Thorazine | (chlorpromazine hydrochloride) |
| Haldol | (haloperidol) |

On the basis of a record much more extensive than that before this court, a federal district court summarized the effects of such anti-psychotic drugs as follows:

> Anti-psychotic drugs are chemical agents used to manage and treat serious mental illness. They are also referred to as neuroleptic drugs and psychotropic drugs.... In general, the drugs influence chemical transmissions to the brain, affecting both activatory and inhibitory functions. Because the drugs' purpose is to reduce the level of psychotic thinking, it is virtually undisputed that they are mind-altering.

> Foremost among the possible side effects of anti-psychotic drugs is tardive dyskinesia. Tardive dyskinesia is a neurological side effect which may appear after prolonged use of anti-psychotic drug treatment. The disease is the outcome of a complex patient-drug interaction which is not currently well understood. The overt symptoms of tardive dyskinesia include certain involuntary motor movements, particularly of the face, lips, and tongue. Tardive dyskinesia can also cause the involuntary movement of fingers, hands, legs and the pelvic area. In its most progressive state, the disease can interfere with swallowing and can affect all motor activity. While in mild cases the disease can simply be a source of embarrassment, it can be physically and psychologically disabling. Until very recently, tardive dyskinesia was considered irreversible. Some studies now suggest that in certain cases it can be effectively treated.

> Recent studies also suggest that tardive dyskinesia is more widespread in mental patients than previously considered. Two studies now place the prevalence of tardive dyskinesia among chronically hospitalized schizophrenics at 50% and 56%. With respect to out-patients, one survey has reported a prevalence rate of 41%....

> There are also a variety of neurological side effects of anti-psychotic drugs, known as extrapyramidal effects. These include akathisia (motor restlessness—the inability to sit still), akanesia (physical immobility and lack of spontaneity), dystonia (spasmodic muscle reaction frequently characterized by a twisting of the neck) and pseudo-parkinsonian syndrome (mask-like face, rigidity of the hand). These conditions are not considered to be irreversible.

(footnotes omitted). *Rogers v. Okin,* 478 F.Supp. 1342, 1360 (D.Mass.1979), *affirmed in part, reversed in part,* 634 F.2d 650 (1st

Cir.1980), *remanded sub nom Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

The objectionable side effects of psychotropic medications can be to some extent ameliorated with other medications. Appellant alleged that he requested Cogentin (benztropine mesylate) and Artane (trihexyphenidyl hydrochloride), both anti-parkinson agents, but that his requests had been refused.

### SCOPE OF INQUIRY

There are a number of related issues which are *not* raised by this appeal, and on which we offer no opinion.

First, this appeal does not involve any right of a *voluntary* patient to refuse psychotropic drugs. As discussed more fully below, such a right is apparently explicitly recognized by statute.

■ Second, this appeal does not involve any right of a child, or a person adjudged legally incompetent, to refuse psychotropic drugs. Appellant is an adult who has not been adjudged incompetent. A.R.S. § 36–506 explicitly provides that court-ordered treatment is not a determination of legal incompetency, with one exception which is not relevant here.[1]

Third, this appeal does not involve any right to refuse psychotropic drugs in an emergency. The parties agree that psychotropic drugs may be forcibly administered when the patient poses an immediate threat of physical injury to himself or others. This definition of "emergency" is consistent with that in A.R.S. § 36–513, which uses the term "emergency for the safety of the person or others." A.R.S. § 36–512, providing for emergency medical care, has no application to the administration of psychotropic drugs. We decline to expand the definitions of "emergency" in A.R.S. §§ 36–512 and –513 to include the threat of deterioration in the patient's psychological condition. *Cf. Rogers v. Okin,* 634 F.2d 650, 659–660 (1st Cir.1980).

Fourth, this appeal is confined to the forcible administration of psychotropic drugs, and does not involve other treatments, or any general right to a "least restrictive treatment."

Fifth, this appeal does not involve the propriety of involuntary commitment in the first place, or the grounds therefor as set forth in the statutes.

Sixth, this appeal does not involve any right *to* treatment, i.e., the right of a patient to be free of confinement unless treatment is provided. *Cf. Youngberg v. Romeo, infra; O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *see* Spece, Preserving the Right to Treatment, 20 Ariz.L.R. 1 (1978).

Having defined the scope of our inquiry, we proceed to set forth the source and scope

---

1. § 36–506 Civil rights not impaired; discriminations prohibited

    A. Persons undergoing evaluation or treatment pursuant to this chapter shall not be denied any civil right, including but not limited to, the right to dispose of property, sue and be sued, enter into contractual relationships and vote. Court-ordered treatment or evaluation pursuant to this chapter is not a determination of legal incompetency, except to the extent provided in § 36–512. Appellee contends that since, under A.R.S. § 36–533(A)(3), a petition for treatment must allege that the patient is "unwilling to accept or incapable of accepting treatment voluntarily", a subsequent court order for treatment must necessarily include a finding of "limited incompetence", i.e., incompetence to participate in treatment decisions. We disagree.

    While the statutes require an *allegation* of unwillingness/incapacity, they do not require a *finding* of such, and that finding is not regularly made. A.R.S. § 36–540 requires, as a prerequisite to court-ordered treatment, a finding that the patient is

    A. a danger to himself and in need of treatment,

    or B. a danger to others and in need of treatment,

    or C. gravely disabled.

    Even if the court finds that the patient is "unwilling to accept or incapable of accepting treatment voluntarily", such a finding is not the equivalent of a finding that the patient is incompetent to participate in treatment decisions, once a treatment program is started. We believe there is a significant difference between getting the patient into treatment in the first place and subsequently determining the course of that program.

of the right of an adult who has not been adjudged incompetent but who is involuntarily committed to the state hospital to refuse, in non-emergency situations, to take psychotropic drugs prescribed for his treatment.

## CONSTITUTIONAL RIGHTS

■■ The United States Supreme Court has recognized that an individual has a liberty interest in freedom from bodily restraint which is protected by the Due Process Clause and which survives his involuntary commitment to a state mental institution. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). To the extent that medication is administered forcibly and/or for the purpose of accomplishing bodily restraint, an individual has a similar right to freedom from such administration. An individual also has a right to such minimally adequate training as reasonably may be required to ensure freedom from undue restraint. *Id.* The state, in the persons of hospital employees,

> may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training.

*Id.,* 102 S.Ct. at 2462. The Court defined what is meant by the judgment and decision of a professional:

> By "professional" decision-maker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

*Id.,* fn. 30, 102 S.Ct. at 2462. While this case was briefed and argued before the decision in *Youngberg v. Romeo,* we believe appellee's position to be that the procedures at the state hospital meet this constitutional standard. However, we do not believe that question to be dispositive of this case.

The issue presented in this case was also presented in *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). The Supreme Court did not reach the merits, but remanded the case to the Court of Appeals for the First Circuit for reconsideration of its decision in *Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980), in light of the intervening decision of the Supreme Judicial Court of Massachusetts in *In the Matter of Guardianship of Richard Roe, III,* 383 Mass. 415, 421 N.E.2d 40 (1981), holding that, under the common law of Massachusetts and the federal constitution, an individual has a protected liberty interest in deciding for himself whether to submit to the administration of antipsychotic drugs.

While the Supreme Court did not reach the merits, it did offer some comments on the role of state law in the resolution of the issue:

> As a practical matter both the substantive and procedural issues are intertwined with questions of state law. In theory a court might be able to define the scope of a patient's federally protected liberty interest without reference to state law. Having done so, it then might proceed to adjudicate the procedural protection required by the Due Process Clause for the federal interest alone.... For purposes of determining actual rights and obligations, however, questions of state law cannot be avoided. Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution.... If so, the broader state protections would define the actual substantive rights possessed by a person living within that State.
>
> Where a State creates liberty interests broader than those protected directly by the Federal Constitution, the procedures mandated to protect the federal substan-

tive interests also might fail to determine the actual procedural rights and duties of persons within the State. Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, ... the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law. Moreover, a State may confer *procedural* protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State.

*Id.,* 102 S.Ct. at 2448–2449 (citations and footnotes omitted). We agree with the Supreme Court's observations and comments. For the reasons set forth below, we conclude that Arizona law requires considerably more than the minimal requirements of the federal constitution, and that the procedures presently utilized at ASH are deficient as a matter of state law.

### STATE LAW

The Arizona Mental Health Services Act (MHSA) consists of Title 36, Chapter 5, A.R.S. §§ 36–501 *et seq.* The former statutory scheme was thoroughly examined and seriously criticized. Wexler, Scoville, et al., Special Project—The Administration of Psychiatric Justice: Theory and Practice in Arizona, 13 Ariz.L.R. 1 (1971). In 1974, the legislature enacted the MHSA, completely revising the existing law and adopting what was considered a progressive approach to civil commitment. Shuman, Hegland and Wexler, Arizona's Mental Health Services Act, 19 Ariz.L.R. 313 (1977). The MHSA has been amended several times, most extensively in 1979.

The process of involuntary commitment is commenced by the filing of a petition for treatment, the contents of which are prescribed by statute:

§ 36–533. Petition for treatment

A. The petition for court-ordered treatment shall allege:

1. That the patient is in need of a period of treatment because he is, as a result of mental disorder, a danger to self or to others or gravely disabled.

2. That there are no other treatment alternatives which are appropriate or available.

3. That the patient is unwilling to accept or incapable of accepting treatment voluntarily.

. . . .

The court, in ordering treatment, found that appellant was a danger to himself or others and was unwilling to accept or incapable of accepting treatment voluntarily.

Since 1974, a right to refuse treatment has been specifically recognized by statute.

§ 36–114. Limitation upon authority to impose treatment

Nothing in this title shall authorize the department or any of its officers or representatives to impose on any person against his will any mode of treatment, provided that sanitary or preventive measures and quarantine laws are complied with by the person . . . .

The quoted section is part of Chapter 1 of Title 36, containing general provisions applicable to the Department of Health Services, and was effective April 1, 1974. The section is not part of Chapter 5 of Title 36, Mental Health Services, effective October 15, 1974. While there is no case law applying or interpreting § 36–114, and the matter has never been formally resolved, one commentator has suggested that Chapter 5, and especially Article 5, authorizing involuntary commitment, being later and more specific, carved out an exception to the pre-existing § 36–114, leaving only voluntary patients with the right to refuse treatment. White, Protection following Commitment: Enforcing the Rights of Persons Confined in Arizona Mental Health Facilities, 17 Ariz.L.R. 1090, 1095–1097 (1975).

In light of generally recognized principles of statutory construction, we agree and do not believe that § 36–114 is controlling here.

There appear to be two rules of construction in reconciling a general statute and a specific statute both of which are applicable. (1) A general comprehensive statute and a special statute dealing with part of the same subject more specifically should generally be read together and harmonized, if possible, to effect legislative intent.... (2) When provisions of a general statute are inconsistent with those of a special nature on the same subject, the special statute controls.

*Arden-Mayfair, Inc. v. State Department of Liquor Licenses and Control,* 123 Ariz. 340, 342, 599 P.2d 793, 795 (1979) (citations omitted). Both A.R.S. § 36–114 and certain provisions of the MHSA deal with a patient's right to refuse treatment. The MHSA provisions are both later and more specific, and therefore control over anything to the contrary in A.R.S. § 36–114.

Within the MHSA itself, in 1979 a new introductory clause was added to A.R.S. § 36–511, which now recognizes a limited right to refuse medical care and certain psychiatric treatments.

§ 36–511. Quality of treatment

A. Subject to his right to refuse psychiatric and medical treatment pursuant to §§ 36–512 and 36–513 and pursuant to regulations of the department every person undergoing evaluation or treatment pursuant to this chapter shall receive physical and psychiatric care and treatment for the full period he is detained. The agency providing care and treatment shall keep a clinical record for each person which details all medical and psychiatric evaluations and all care and treatment received by the person.

. . . .

§ 36–512. Emergency medical care

A person undergoing evaluation or treatment has a right to refuse any and all medical treatment unless ordered by the court, except that when, in the written opinion of the attending physician, a true medical emergency exists and medical care and treatment including surgical procedures are necessary to save the life, physical health, eyesight, hearing or member of the person, the medical director of the agency may give consent to such medical care and treatment if time will not permit the obtaining of appropriate judicial authority. The patient's guardian, if one exists, shall be notified by the medical director of the giving of emergency medical care immediately.

§ 36–513. Seclusion; restraint; treatment

A person undergoing evaluation pursuant to article 4 of this chapter shall not be treated for his mental disorder unless he consents to such treatment, except that seclusion and mechanical or pharmacological restraints may be employed in the case of emergency for the safety of the person or others. A person undergoing treatment pursuant to article 5 of this chapter shall not be subjected to seclusion or mechanical or pharmacological restraints except in case of emergency for the safety of the person or others or as a part of a written plan for the treatment of the patient, prepared by staff members responsible for his care and pursuant to regulations promulgated by the department. All instances of seclusion or restraint shall be properly recorded in the patient's medical record and the use shall be governed by written procedures of the agency caring for the patient and are subject to the rules and regulations of the department.

A summarized outline of A.R.S. §§ 36–511, –512, and –513 discloses:

(36–511) A patient shall receive physical and psychiatric care, except:

(36–512) 1. A patient may refuse medical treatment, except:

    a. court-ordered treatment, or

    b. emergency treatment

and

(36–513) 2. a patient shall not be secluded or restrained, except:

    a. in an emergency, or

    b. as part of a written plan for treatment and pursuant to department regulations

and

(36–511) 3. a patient may refuse treatment pursuant to regulations of the department of health services.

■ We believe that A.R.S. § 36–512 was intended to govern "medical treatment," but exclusive of psychiatric treatment. When read in its entirety, the statute appears to be restricted to non-psychiatric medical treatment, some examples of which are enumerated. Furthermore, A.R.S. § 36–511 distinguishes between "physical" and "psychiatric" care. Accordingly, § 36–512 qualifies the § 36–511 mandate of physical care, and § 36–513 qualifies the § 36–511 mandate of psychiatric care. Consequently, A.R.S. § 36–512 is not relevant here.

■■ Psychotropic medication is clearly one of the "pharmacological restraints" to which a patient shall not be subjected, with two exceptions. A.R.S. § 36–513. The first exception, an emergency, is not involved here (see discussion above). The second exception has two parts. The administration of psychotropic drugs, against the patient's will, must be

1. as part of a written plan for the treatment of the patient, and

2. pursuant to regulations promulgated by the department.[2]

"... as part of a written plan ... prepared ... pursuant to regulations promulgated by the department."
We believe that the first construction is correct, for the following reasons.

First, when § 36–513, as amended, is read as a whole, the overall intent and effect is to restrict the circumstances under which seclusion and restraint can be imposed. The present first sentence of the section greatly expands the right of an *evaluation* patient to refuse treatment. That patient can be subjected to seclusion or restraint *only* in the case of an emergency. Since the amended first sentence defines the circumstances under which seclusion or restraint can be imposed, it is reasonable to conclude that the amended second sentence was likewise intended to define the circumstances under which seclusion or restraint can be imposed. The first construction is consistent with such an intent, while the second construction would only add a requirement relating to the preparation of a treatment plan. The first construction—more "substantive" than "procedural"—is therefore preferable.

Second, the construction we adopt is consistent with the third sentence of the section which, as we understand it, requires that:
"All instances of seclusion or restraint ... are subject to the rules and regulations of the department."
Thus, the second sentence and/or the third sentence of the section require that the department adopt, and abide by, regulations concerning the imposition of seclusion or restraint.

Third, the construction we adopt is more consistent with the amended § 36–511, which clearly contemplates that the right to refuse psychiatric and medical treatment is not limited to those circumstances set forth in subsequent sections, but is also governed by department regulations. The 1979 amendments to § 36–511(A) were as follows:
Section 10. Section 36–511, Arizona Revised Statutes, is amended to read:

---

2. Our conclusion that the administration of psychotropic drugs against the patient's will must be pursuant to department regulations is based on our reading of A.R.S. § 36–513, the 1979 amendments thereto, and the relevant legislative history. The 1979 amendments were as follows:
FIRST REGULAR SESSION—1979 Ch. 64
Sec. 12. Section 36–513, Arizona Revised Statutes, is amended to read:
§ 36–513. Seclusion; restraint; treatment
A person undergoing evaluation ~~or~~ pursuant to article 4 of this chapter shall not be treated for his mental disorder unless he consents to such treatment, except that seclusion and mechanical or pharmacological restraints may be employed in the case of emergency for the safety of the person or others. A person undergoing treatment pursuant to article 5 of this chapter shall not be subjected to seclusion or mechanical or pharmacological restraints except in case of emergency for the safety of the person or others or as a part of the written plan for the treatment of the patient, prepared by staff members responsible for his care and pursuant to regulations promulgated by the department. All instances of seclusion or restraint shall. be properly recorded in the patient's medical record and the use shall be governed by written procedures of the agency caring for the patient and are subject to the rules and regulations of the department.
(additions underscored, deletions struck). Of significance here is the addition of the clause at the end of what is now the second sentence of the section: "and pursuant to regulations promulgated by the department". The antecedent of that clause is not immediately obvious, and two alternative constructions are possible:
"A person ... shall not be subject to ... pharmacological restraints except ... pursuant to regulations promulgated by the department."
or

Furthermore, § 36–513 requires that the use of seclusion or restraint "shall be governed by written procedures of the agency [i.e., ASH]." All three requirements are designed to prevent the arbitrary, indis-

criminate, or unnecessary imposition of certain physically or emotionally unpleasant treatments.

The record before us contains no written plan for the treatment of appellant, and we

> § 36–511. Quality of treatment
> A. <u>Subject to his right to refuse psychiatric and medical treatment pursuant to §§ 36–512 and 36–513 and pursuant to regulations of the department</u> every person undergoing evaluation or treatment pursuant to this chapter shall receive physical and psychiatric care and treatment for the full period he is detained. The agency providing care and treatment shall keep a clinical record for each person which details all medical and psychiatric evaluations and all care and treatment received by the person.
> (additions underscored).

Fourth, the construction we adopt is more consistent with the amended § 36–512, which recognized a right to refuse *medical* treatment, subject to exceptions which are more "substantive" than "procedural". The 1979 amendments to § 36–512 were as follows:

> Sec. 11. Section 36–512, Arizona Revised Statutes, is amended to read:
> § 36–512. Emergency medical care
> <u>A person undergoing evaluation or treatment has a right to refuse any and all medical treatment unless ordered by the court, except that</u> when, in the written opinion of the attending physician<u>,</u> ~~of a patient at the state hospital,~~ a true medical emergency exists and ~~a surgical operation is~~ <u>medical care and treatment including surgical procedures are</u> necessary to save the life, physical health, eyesight, hearing or member of the ~~patient~~ <u>person</u>, the ~~superintendent~~ <u>medical director of the agency</u> may give consent to such ~~surgical operation~~ <u>medical care and treatment</u> if ~~the consent of the proper relatives or guardian cannot be had in time to effect such saving and~~ time will not permit the obtaining of appropriate judicial authority. <u>The patient's guardian, if one exists, shall be notified by the medical director of the giving of emergency medical care immediately.</u>
> (additions underscored, deletions struck).

Fifth, the construction we adopt is consistent with the legislative history of the 1979 amendments. Those amendments were introduced as S.B. 1160. While there was committee discussion of some of the amendments, the amendments to § 36–513 were adopted exactly as proposed, with no discussion, so the legislative history is admittedly sparse. A "Summary Analysis of S.B. 1160", prepared by the Arizona Legislative Council and dated March 2, 1979, stated, in pertinent part:

> *Patient's rights*
> Many other amendments included in this bill relate to provisions for informing the pa-

tient or proposed patient of the purpose of procedures and of his legal and civil rights and for *preserving the right of the person undergoing evaluation or treatment to refuse all medical treatment or treatment for mental disorder except emergency treatment.* A person being evaluated would have to be released within 72 hours unless a petition for court-ordered treatment has been filed. He would have a right to counsel, court-appointed if necessary, whose minimal duties are specified in this bill. Procedure on a petition for court-ordered treatment would be specified in detail.
(emphasis added).

The legislature clearly defined the circumstances in which an *evaluation* patient could refuse seclusion or restraint, i.e., "in the case of emergency for the safety of the person or others." Commenting on the reason that the legislature could not (and did not) likewise clearly define the circumstances in which a *treatment* patient could refuse seclusion or restraint, the drafter of the amendments stated:

> This is a very technical, difficult and ever changing area and it is recommended that a task force be appointed to recommend guidelines and procedures for mental health treatment agencies. These matters are best left to administrative rule rather than to statute.

Hegland and Wexler, Report on the Mental Health Services Act (August 4, 1976), (unpublished report in University of Arizona Law School Library). Appellee cited the above passage in its brief, and commented that

> the Legislature clearly did not codify any right to refuse psychiatric treatment *after* commitment, and it left the use of treatment medications to "administrative rule".

We agree that the legislature intended to leave the matter to administrative rule. But we do *not* believe that the legislature intended to leave the matter to unfettered administrative discretion. The principle favoring the promulgation of rules and regulations of general applicability rather than the generation of policy in a piecemeal fashion through ad hoc administrative determinations and adjudications is well established and has received repeated judicial endorsement. *Arizona Corporation Commission v. Palm Springs Utility Co., Inc.,* 24 Ariz. App. 124, 536 P.2d 245 (1975); *State of Arizona ex rel Dandoy v. City of Phoenix,* 133 Ariz. 334, 651 P.2d 862 (1982). We believe that the legislature directed the department to develop, adopt, and implement official regulations. From the record before us, we cannot say that the department has complied with this mandate.

are unable to determine whether one in fact exists. Furthermore, the record before us contains no department regulations. Our own search has revealed only the following relevant regulations, which do no more than repeat the terms of the statutes:

R9–15–306. Posting of patients' rights

A. All evaluation agencies or mental health treatment agencies shall post a list of patients' rights in English and Spanish in all facilities. Each agency shall inform each patient of these rights and enter such notification in the patient's record. Such lists shall be entitled "PATIENT'S RIGHTS, LIMITATIONS, EXCEPTIONS", and shall include, but not be limited to, the following:

. . . .

9. Every person undergoing evaluation or treatment pursuant to Arizona Revised Statutes, Title 36, Chapter 5, shall receive physical and psychiatric care and treatment for the full period of his hospitalization.

10. A patient undergoing evaluation or treatment shall not be subjected to seclusion or mechanical or pharmacological restraints except in case of emergency for the safety of the person or others or as part of a written plan for the treatment of the patient, prepared by staff members responsible for his care.

It is our opinion that A.R.S. § 36–513 mandates more specific regulations than those set forth above. The statute requires regulations directly governing the use of seclusion and restraints.

Finally, the record before us contains no "written procedures of the agency caring for the patient", i.e., ASH, and we are unable to determine whether any in fact exist. In oral argument, counsel for appellee indicated that some written guidelines do exist, guidelines comparable to those approved in *Rennie v. Klein*, 653 F.2d 836 (3rd Cir.1981). However, no copy of any such guidelines has been provided to this court.

■ Absent a written treatment plan, department regulations, and agency procedures, we can only conclude that the administration of psychotropic drugs to appellant is a pharmacological restraint to which he cannot be subjected. A.R.S. § 36–513 sets forth the only two circumstances under which a treatment patient can be subjected to pharmacological restraints. Since the first (emergency) is not relevant here and the second (written treatment plan and department regulations) has not been met, the trial court was without authority to order appellant subjected to psychotropic medication. A.R.S. § 36–513, unlike § 36–512, contains no provision for court-ordered treatment under circumstances other than those specifically enumerated in the statute itself.

Therefore, the order of the trial court is vacated until such time as appellee presents to that court copies of

1. an individualized written treatment plan for appellant,

2. official department regulations governing the use of seclusion and restraint, in non-emergency situations and against the will of the patient, and

3. written agency procedures governing the use of seclusion and restraint, in non-emergency situations and against the will of the patient.

The legislature has deferred to administrative department and agency expertise. It has authorized, indeed mandated, that professionals adopt appropriate regulations and procedures governing the treatment of mental patients. We are in no better position than the legislature to dictate the content of those regulations and procedures, except insofar as they are limited by the constitutional rights of the patient. *Youngberg v. Romeo, supra.*

This matter is reversed and remanded to the superior court for further proceedings consistent with this opinion.

OGG and CORCORAN, JJ., concur.